# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Pictometry International Corporation,

      Plaintiff,

  v.

Geospan Corporation,

      Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 13-2359 ADM/JJK

_____

Joseph P. Titterington, Esq., and Douglas J. Sorocco, Esq., Dunlap Codding PC, Oklahoma City, OK, and Rachel K. Zimmerman, Esq., Merchant & Gould PC, Minneapolis, MN, on behalf of Plaintiff.

Kurt J. Niederluecke, Esq., Grant D. Fairbairn, Esq., and Ted C. Koshiol, Esq., Fredrikson & Byron, PA, Minneapolis, MN, on behalf of Defendant.

_____

## I.  INTRODUCTION

On December 16, 2013, the undersigned United States District Judge heard oral argument on Plaintiff Pictometry International Corporation's ("Pictometry") Motion for Preliminary Injunction and Request for Evidentiary Hearing [Docket No. 25] and its Motion to Dismiss Defendant Geospan Corporation's ("Geospan") Antitrust Counterclaim [Docket No. 12]. Geospan opposes both motions.  For the reasons stated herein, Pictometry's motion for injunctive relief is denied, and its motion to dismiss the antitrust counterclaim is granted.

## II.  BACKGROUND

### A.  Litigation History

This is the fourth lawsuit between the parties in the past six years.  On March 20, 2008, Geospan filed suit against Pictometry, alleging infringement of United States Patent No. 5,633,946 (the "'946 Patent") (action referred to as "Geospan I").  On March 31, 2011, this

Court entered a declaratory judgment of non-infringement in Pictometry's favor.  See Geospan Corp. v. Pictometry Int'l Corp., No. 08-816, 2011 WL 1261583 (D. Minn. Mar. 31, 2011). Geospan appealed, and on June 5, 2012, the Federal Circuit Court of Appeals affirmed the declaration of non-infringement in a per curiam decision.  See Geospan Corp. v. Pictometry Int'l Corp., 469 F. App'x 913 (Fed. Cir. 2012).

On October 13, 2009, while Geospan I was still pending, Pictometry sued Geospan in the Western District of New York, alleging infringement of United States Patent No. 5,247,356 (the "'356 Patent") (action referred to as "Geospan II").  On June 2, 2011, the Western District of New York transferred Geospan II to the District of Minnesota, where it was assigned to Judge John R. Tunheim.  See Order, May 5, 2011 [Geospan II Docket No. 42].[1]  On August 17, 2012, the Court construed one of the patent claims at issue and invalidated the other.  See Pictometry Int'l Corp. v. Geospan Corp., No. 11-1423, 2012 WL 3679208 (D. Minn. Aug. 17, 2012). Thereafter, Pictometry stipulated to the dismissal of Geospan II, agreeing that based on Judge Tunheim's Order, Geospan had not infringed the '356 Patent.  Stipulation [Geospan II Docket No. 75].

On May 10, 2013, Geospan filed another suit against Pictometry in the District of Minnesota, again alleging Pictometry infringed the '946 Patent at issue in Geospan I.  That action ("Geospan III"), before Judge Susan R. Nelson, is ongoing.

Then, on August 28, 2013, Pictometry filed the present action ("Geospan IV") against

---

[1]  Geospan I had Civil Case Number 08-816, Geospan II had Civil Case Number 11-1423, and Geospan III (discussed below) has Civil Case Number 13-1104.  Each case's docket will be cited as noted above.  Entries in Geospan IV, this action, will be cited as "[Docket No. 1]."

Geospan in this district.  Compl. [Docket No. 1].  Pictometry's sole cause of action alleges

Geospan infringed United States Patent No. 7,424,133 (the "'133 Patent"), which Pictometry

owns by assignment.

**B.  The '133 Patent**

Pictometry and Geospan sell products and services in the field of photogrammetry, the

science of obtaining accurate information about physical objects through the interpretation of

photographs or other visual images.  Theodore M. Lachinski Decl. [Docket No. 42] ¶ 2.

Pictometry specializes exclusively in aerial photogrammetry, meaning it flies aircraft with

specialized cameras over a geographic area to collect images.  Pictometry then uses these images

to compile usable data about the terrain.  See Stephen L. Schultz Decl. [Docket No. 27] ¶ 3.

Geospan initially began its photogrammetry services using ground-based vehicles equipped with

special cameras, later expanding into aerial photogrammetry during the late 1990's and early

2000's.  Lachinski Decl. ¶¶ 3-5.  Pictometry and Geospan have directly competed in aerial

photogrammetry since 2005.  According to Geospan CEO Thomas Lachinski, Pictometry has an

estimated 99% market share, while Geospan has the remaining 1%.  Id. at ¶ 6.

The '133 Patent relates to the use of oblique imaging in photogrammetry.  Compl.

[Docket No. 1] Ex. A (the "'133 Patent").  The '133 Patent specification summarizes the

drawbacks associated with traditional photogrammetry, which typically uses orthogonal (at right

angle) images.  In this process, for instance, a plane would capture images by pointing a camera

straight down at a "nadir point" directly underneath it.  In the resulting image, only the nadir

point is actually at a right angle to the camera; all other points (also referred to as "pixels")

around the nadir are at oblique angles and thus increasingly distorted as they get further from the

nadir. '133 Patent at 1:30-45.  The process of correcting these distortions may leave the corrected (or "ortho-rectified") image difficult for untrained observers to use.  The corrected images also include "substantially no information" about the height of the pictured terrain.  Id. at 1:56–2:10.

When an image-capturing device aims at a non-right angle relative to the terrain, it results in "oblique images."  These images of terrain display the sides of features on land, such as the sides of a house or the ridges of a mountain, and are much easier for a viewer to intuitively understand.  Id. at 2:11-20.  However, oblique images have traditionally been of little or no use in photogrammetry, because correcting the images for their skewed angles results in finished images that are even more distorted than corrected orthogonal images, and the resulting images do not offer usable geo-location data or accurate measurement data.  Id. at 2:33-47.

The '133 Patent describes a method and apparatus for "capturing, displaying, and making measurements of objects and distances between objects depicted within oblique images."  Id. at 2:60-64.  The invention uses oblique images, along with corresponding positional data, to calculate the distance between selected points.  In essence, it uses the more intuitive oblique images to perform some of the same tasks previously performed by orthogonal images in photogrammetry.  Id. at 2:60–3:12.

## C.  The Parties' Claims

On approximately January 19, 2011, the City of Branson, Missouri, held a request for proposals (RFP) for a mapping project.  Compl. ¶ 16.  Aeroquest Optimal, Inc. ("Aeroquest") submitted a bid in the RFP, and identified Geospan as a subcontractor.  Compl. Ex. 3 (Aeroquest RFP).  As part of the bid, Geospan described its "Geovista" system as allowing "users to see

every location from every angle in a given area and measure anything accurately." Id. Geospan also offered software allowing "the user to view and navigate on the oblique imagery and measure the distance, height, area, bearing, elevation, and roof pitch of features in the images." Id.

On August 28, 2013, Pictometry filed the present action ("Geospan IV") against Geospan, alleging Geospan has directly and indirectly infringed the '133 Patent through its Geovista system. Compl. ¶¶ 19-27. On October 4, 2013, Geospan filed counterclaims against Pictometry, claiming: (1) the Court should issue a declaratory judgment of non-infringement of the '133 Patent; (2) the '133 Patent is invalid; (3) Pictometry has violated Section 2 of the Sherman Act by engaging in anti-competitive conduct; and (4) Pictometry has abused judicial process. Answer & Countercl. [Docket No. 10] ("Countercl.").

On October 25, 2013, Pictometry moved to dismiss the Sherman Act count of the Counterclaim. On November 12, 2013, Pictometry also moved for a preliminary injunction restricting Geospan from infringing any claim of the '133 Patent.

## III.  DISCUSSION

### A.  Preliminary Injunction

Courts are authorized to grant injunctive relief to protect patent rights. 35 U.S.C. § 283. A preliminary injunction is "an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must demonstrate: "(1) a reasonable likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's favorable impact on the public interest." Amazon.com, Inc. v. Barnesandnoble.com,

5

Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001).  The movant cannot obtain a preliminary injunction

unless it establishes both of the first two factors.  Id.

**1.  Likelihood of Success**

For Pictometry to demonstrate a likelihood of success, it must show, "in light of the

presumptions and burdens that will inhere at trial on the merits," that: (1) Pictometry will likely

prove Geospan infringes the '133 Patent; and (2) the infringement claim will withstand

Geospan's validity and infringement challenges.  Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d

1361, 1364 (Fed. Cir. 1997).  Simply put, if Geospan raises a "substantial question" as to the

'133 Patent's validity, or Geospan's alleged infringement, the preliminary injunction should not

issue.  See id.

An infringement analysis involves two steps.  First, the court construes the meaning and

scope of the patent claim at issue as a matter of law.  Second, the court determines whether the

accused product infringes the patent claim as construed.  Amazon.com, 239 F.3d at 1351.  To

infringe, the accused product must embody each claim limitation or its equivalent.  Sofamor

Danek Grp., Inc. v. DePuy-Motech, Inc., 74 F.3d 1216, 1221 (Fed. Cir. 1996).  At the

preliminary relief stage, a district court need not issue conclusive claim constructions and

infringement findings.  Id.

Intrinsic evidence is the "most significant source" of meaning in claim construction.  See

Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  First, the words of

the claims themselves, both asserted and non-asserted, should define the scope of the invention.

Id.  Claim terms "should be construed consistently with [their] appearance in other places in the

same claim or other claims of the same patent."  Rexnord Corp. v. Laitram Corp., 274 F.3d 1336,

1342 (Fed. Cir. 2001).  Claim words should also receive their plain and ordinary meaning, though a patentee may "choose to be his own lexicographer" by clearly stating the definition of a claim term in the specification or prosecution history.  Vitrionics, 90 F.3d at 1582.  Second, the court must always review the specification for any use of a term inconsistent with its plain and ordinary meaning.  The specification acts as a dictionary, providing both express and implicit terms: it is "the single best guide to the meaning of a disputed term."  Id.  Third, the court may also consider the prosecution history of the patent if it is in evidence.  Id. at 1582-83.  Finally, the court may only consider extrinsic evidence if the above intrinsic evidence fails to resolve an ambiguity.  Id. at 1583.

For the purposes of its motion for a preliminary injunction, Pictometry argues Geospan infringed only Claim 17 of the '133 Patent.  Claim 17 states:

> 17.   A computerized method for taking measurements from an oblique image displayed on a computer system, at least one input device connected to said computer system, an image data file accessible by said computer system, said image data file including captured images and positional data corresponding thereto, said computerized method comprising:
>
> placing the computer system into a desired one of a plurality of measurement modes, the desired measurement mode configured for calculating a desired measurement;
>
> selecting a starting point on the displayed image;
>
> retrieving the positional data corresponding to said starting point;
>
> selecting an end point on the displayed image;
>
> retrieving the positional data corresponding to said end point; and
>
> calculating the desired measurement dependent at least in part upon said positional data of said starting and end points;

> wherein said plurality of measurement modes comprise a **distance measuring mode** calculating a distance between two or more selected points, a height measuring mode calculating a height difference between two or more selected points, a relative elevation measurement mode calculating the difference in elevation of two or more selected points, and an area measurement mode calculating the area encompassed by at least three points.

'133 Patent at 16:36-61 (emphasis added).  For the purposes of this motion, the parties dispute only one term in Claim 17: "distance measuring mode."

### a. "Distance measuring mode"

Several claims in the '133 Patent, other than Claim 17, expressly rely on a tessellated ground plane to determine the position of a given pixel in an oblique image.  A tessellated ground plane is essentially a simplified computer model of a given area, which uses contiguous "tiles" to depict terrain in three dimensions.  Dana Slaymaker Decl. [Docket No. 28] ¶¶ 11-12. The tessellated ground plane may be created using topographical maps, survey data, and other sources.  '133 Patent at 10:46-50.  In basic terms, the patented system enables the extraction of geographic coordinates and elevation data for a pixel in an oblique image by associating that pixel with its corresponding position on the tessellated ground plane.  Slaymaker Decl. ¶ 16. This allows a user, among other things, to determine the three-dimensional locations of two pixels in a single oblique image, and measure the approximate geographic distance between them.  See, e.g., '133 Patent at 15:4-11.  Traditional methods of measurement would require additional images and triangulation techniques.  Pl.'s Mem. Supp. Prelim. Inj. [Docket No. 26] 13 n.6.

The specification states that the "distance measuring mode" of the software described in the patent uses a "walk the earth" method of calculating the distance between points.  Id. at 9:47-

67. The "walk the earth" method measures the distance between two points by closely following (or "walking") along the simulated terrain of the tessellated ground plane.  This approach allows the software to calculate the distance more accurately than a top-down or "flat earth" measurement because it accounts for changes in elevation.  Id.  As an example, the '133 Patent states a contractor preparing to bid on a contract for paving a roadway could use the "walk the earth" method to estimate the amount of roadway needed over hilly terrain.  A top-down or "flat earth" measurement of the same roadway would ignore changes in elevation, and thus significantly underestimate the length of roadway needed.  Id. at 10:1-9.

The parties' disagreement centers on whether the "distance measuring mode" described in Claim 17 necessarily uses the "walk the earth" method of measurement, or whether it may also encompass the linear, "flat earth" method of measuring distance.  Geospan proposes that "distance measuring mode" should mean:

> a mode that determines the distance between two or more selected pixels/points according to a walk the earth method that creates a series of interconnected line segments that extend between the selected pixels/points and which lie upon or conform to the planar faces of a series of interconnected facets that define a tessellated ground plane, wherein the tessellated ground plane is not a digital elevation model[.]

Def.'s Mem. Opp. Prelim. Inj. [Docket No. 40] 18.  This proposed construction requires the use of a "walk the earth" method in connection with a tessellated ground plane.

In contrast, Pictometry proposes "distance measuring mode" should mean: "state which enables the computer system to perform distance measuring between at least two points."  Id.  Pictometry argues this proposed construction would mean Claim 17 could use either a "walk the earth" or a "flat earth" method of measuring the distance between points.  Under Pictometry's

construction, Claim 17 would not require the use of a tessellated ground plane.  Instead, a "distance measuring mode" that uses a "flat earth" method could rely on traditional triangulation techniques and multiple images.  Pl.'s Supp. 13 n.6.

The language of Claim 17 itself suggests "distance measuring mode" uses the "walk the earth" method.  Claim 17 describes a computer system in which a user may place the system into "one of a plurality of measurement modes" and then use the system to calculate the distance between two points according to that mode.  '133 Patent at 16:36-53.  The claim specifically lists the four measurement modes available to the user, the first of which is at issue here: "a distance measuring mode calculating a distance between two or more selected points."  Id. at 16:54-62.  Two other modes available, the "height measurement mode" and "relative elevation mode" suggest the measurements performed in Claim 17 rely on three-dimensional information.[2]  This suggests the "distance measuring mode" employs the three-dimensional "walk the earth" method.

In addition to the claim language, the specification reflects the inventors' intent to act as their own lexicographers and define "distance measuring mode" as specifically using the "walk the earth" method.  The specification states that it "should also be particularly noted that the distance measuring mode of image display and analysis software [depicted in Figure 5] determines the distance between selected pixels according to a 'walk the earth' method."  Id. at 9:47-51.  Figure 5 provides a simple depiction of the distance measuring software envisioned by the '133 Patent.

---

[2]  The fourth available measurement mode pertains to the measurement of area "encompassed by at least three points," and does not explicitly address the use of three dimensions.  Id. at 16:60-61.

Pictometry attempts to escape this succinct definition by arguing the '133 Patent's use of the term "straight-line" indicates the inventors' intent to allow the patented system to use a "linear" or "flat earth" method of measurement in addition the "walk the earth method." This argument ignores the plain language of the specification. The specification refers, as an example, to paths "P1" and "P2" in Figure 6 of the '133 Patent. Path P1 is referred to as a "straight-line" path because it has only a start point and an end point. Path P2 has a third, intermediary point between the start and end points, and thus represents a path with "one or more 'straight-line' segments."[3] Id. at 9:40-47. The "walk the earth" method, the specification states, uses virtual "interconnected line segments" to measure the distance between the points in both paths P1 and P2. Instead of creating absolutely straight measurements, however, the interconnected line segments "lie upon or conform to" the terrain displayed in the tessellated ground plane, meaning these segments take elevation into account as part of the distance measurement. Id. at 9:54 (emphasis added). A linear or "flat earth" method would not follow the contours of a tessellated ground plane to measure the distance between two points. That P1 is referred to as a "straight-line" segment does not alter this result: a path from the top of a mountain to the bottom could be a straight path as the crow flies, but still have significant changes in elevation. Indeed, this is the very concept articulated by the specification in its example of the paving contractor discussed above. See id. at 10:1-9.

Pictometry also argues, unpersuasively, that the specification merely expresses a preferred method, and not a disavowal of a linear or "flat earth" measurement method. Even if

---

[3] Claim 18 of the '133 Patent addresses the same measuring modes as Claim 17, except that it also allows the user to input one or more intermediate points. Thus, the difference between Claims 17 and 18 is illustrated by the difference between example paths P1 and P2.

11

the inventors had not specifically defined "distance measuring mode" as using the "walk the earth method," the inventors clearly disavowed the "flat earth" method.  A specification may limit the scope of a claim if the specification includes "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."  Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1325 (Fed. Cir. 2002).  The inventors expressed a preference for the "walk the earth" method by writing it "provides a more accurate and useful measurement" than the "flat earth" approach or an "average elevation plane system."  '133 Patent at 9:61-67.  But the inventors ventured still further, by writing: "In contrast to the 'walk the earth' method provided by the present invention, the 'flat earth' or average elevation distance calculating approaches include inherent inaccuracies when measuring distances between points."  '133 Patent at 10:9-14.  This language unambiguously states that the present invention "provides" the "walk the earth" method, a method that is both in contrast to, and superior to, the "flat earth" method.  This statement is a manifest exclusion and disavowal of claim scope.

Given the intrinsic evidence available, "distance measuring mode" will be construed, for the purposes of preliminary relief, as "a mode that determines the distance between two or more selected points according to a walk the earth method."  Claim 17 does not expressly refer to the use of a tessellated ground plane, but the parties appear to agree that the "walk the earth" method necessarily relies on a tessellated ground plane.  As a result, the Court proceeds to interpret "tessellated ground plane."

### b. "Tessellated ground plane"

The parties dispute whether the tessellated ground plane used in the "walk the earth" method may be a digital elevation model, which the Geovista system uses, or whether it must be

a vector-based model.  In its proposed construction of "distance measuring model," Geospan specifically defines the tessellated ground plane as using vector-based polygons, as opposed to a raster-based digital elevation model.  Pictometry argues that a tessellated ground plane may use either a vector-based or raster-based model.

Vector-based and raster-based models are two ways to depict three-dimensional terrain. A vector-based model uses irregularly-shaped polygons (referred to earlier as "tiles") which fit together at different angles to depict a three-dimensional landscape.  Slaymaker Decl. ¶ 12.  A raster-based model (which includes the "digital elevation model" of the Geovista system) uses cubes that are a uniform size but which are arranged at different heights.  These cubes create a three-dimensional model of the terrain that would appear as though it were made of blocks.  Id. at ¶ 13-14.  Pictometry's expert, Dana Slaymaker, states the term "tessellated ground plane" is a broader concept that refers to both vector-based and raster-based models.

Geospan, relying on the '133 Patent's prosecution history, argues Pictometry specifically excluded digital elevation models from the '133 Patent.  During the prosecution of the patent, the United States Patent and Trademark Office (PTO) issued a rejection of several claims, including Claim 7, based in part on the teachings of a reference named "Ciampa."[4]  Excerpts Ex. 2.  With regard to Claim 7, Pictometry responded by distinguishing Ciampa based on the patented invention's use of a tessellated ground plane.  Pictometry wrote that Ciampa relies on the use of digital elevation model data, and "the Digital Elevation Model is not the tessellated ground plane required in Claim 7."  Excerpts Ex. 5, at 14.  In several instances, Pictometry further emphasized

---

[4] During oral argument on this motion, Pictometry submitted a collection of excerpts from the '133 Patent's prosecution history which it had not previously filed, which are cited here as "Excerpts."  Because references to some of the documents therein will be made, Pictometry must now file the relevant excerpts on CM/ECF.

that Ciampa did not anticipate Claim 7 because a tessellated ground plane is different from and superior to a digital elevation model.  See id. at 15-16.  Pictometry argues that its statements with respect to Claim 7 during the prosecution of the '133 Patent have no bearing on the interpretation of Claim 17 here.

Although Pictometry is correct that the cited prosecution history relates to Claim 7 and not Claim 17, the history still has relevance to the construction of Claim 17.  In certain circumstances, the Federal Circuit has allowed the prosecution history for one claim in a patent to determine the meaning of language used in another claim.  See, e.g., Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1584 (Fed. Cir. 1995) ("Competitors must be able to rely on the definition of a claim term given in the prosecution history, even when the term is later incorporated into different claims, in order to understand what constitutes infringement.").  Pictometry does not argue that the tessellated ground plane discussed in connection with Claim 7 is any different than the one used in connection with the "walk the earth" method at issue in Claim 17.  As a result, this prosecution history is relevant to both claims.  See, e.g., id. at 1576 (holding prosecution history limits interpretation of claim terms because claims "may not be construed one way in order to obtain their allowance and in a different way against accused infringers").  In the prosecution history, Pictometry expressly disclaimed digital elevation models, arguing that its own tessellated ground planes were not only different, but superior.  Based on the present record and arguments, the term "tessellated ground plane" does not encompass digital elevation models.

Under the constructions above, Geospan has raised a "substantial question" as to whether it infringes the '133 Patent.  See Genentech, 108 F.3d at 1364.  Neither party specifically

explores ways in which the Geovista system may or may not fulfill the limitations described in

Claim 17.  Nevertheless, the parties agree that Geovista uses a digital elevation model.  Because

the Court finds that the tessellated ground plane used by the "walk the earth" method does not

include digital elevation models, the Court finds Geospan has demonstrated a substantial

question as to whether it has infringed.  This conclusion may be challenged in further claim

construction and/or summary judgment motions, but for the present motion's purposes,

Pictometry failed to demonstrate that it is more likely than not to succeed on the merits.  As a

result of this decision, the issue of the '133 Patent's validity is not reached.  For the same reason,

the remaining preliminary injunction factors are discussed only briefly.

### 2.  Threat of Irreparable Harm

"Irreparable harm is presumed when a clear showing of patent validity and infringement

has been made."  Amazon.com, 239 F.3d at 1350.  Because Pictometry has not clearly

demonstrated infringement, it is not accorded the presumption of irreparable harm.  Even without

the presumption, Pictometry argues it will suffer irreparable harm if not granted this injunction

because there is a high probability that Geospan may file for bankruptcy before the conclusion of

this suit.  Geospan, on the other hand, argues Pictometry has delayed bringing this suit for

several years, suggesting Pictometry does not face any serious harm.  In addition, Geospan

argues that Pictometry's arguments about its financial condition are based on speculation, and

that difficulty in collecting a judgment does not automatically justify a finding of irreparable

harm.

This injunction factor slightly favors Geospan.  While Pictometry did obtain the '133

Patent several years ago, Geospan overlooks its own efforts to challenge the patent's validity

through an inter partes re-examination by the PTO.  This re-examination process began just after

the patent issued in 2008 and lasted several years, ending on June 26, 2012.  See D. Ward

Hobson Decl. [Docket No. 33] ¶¶ 3-17.  Given this long process, and Geospan's direct

involvement, Geospan's argument of delay does not persuade.  Nevertheless, Pictometry's "risk

of bankruptcy" argument does not demonstrate irreparable harm.  Pictometry relies on general

statements, made by Geospan and the Minnesota Court of Appeals, regarding Geospan's failure

to turn a profit in its 20 year existence.  Assuming this is true, Pictometry still has not

demonstrated why an injunction now would place it in a significantly better position to recover

should it win at summary judgment or trial (an outcome that is not assured).

### 3.  Balance of Hardships

The balance of hardships factor favors Geospan.  Pictometry does not dispute having a

much larger market share than Geospan in aerial photogrammetry.  And although Pictometry

alleges that Geospan's sales of Geovista will cost it measurable money damages, it does not

suggest these alleged lost sales would cause it any serious hardship.  Conversely, Geospan

appears to be facing some financial difficulty, and lost sales might increase the risk of insolvency

that Pictometry arguably fears.

### 4.  Public Interest

Pictometry correctly argues the protection of patent rights is in the public interest.  See

Cordis Corp. v. Boston Scientific Corp., 99 F. App'x 928, 935-36 (Fed. Cir. 2004).  However, as

discussed above, whether Geospan actually infringed the patent remains an open question.  As a

result, this factor favors neither party.

**B. Antitrust Counterclaim**

In Count 3 of its Counterclaim, Geospan alleges Pictometry has violated § 2 of the

Sherman Act.  Pictometry moves to dismiss this claim.

**1. Motion to Dismiss Standard**

Rule 12(b)(6) of the Federal Rules of Civil Procedure states that a party may move to

dismiss a complaint for failure to state a claim upon which relief can be granted.  In evaluating

such a motion, the court construes the pleadings in the light most favorable to the nonmoving

party, and the facts alleged in the complaint must be taken as true.  Hamm v. Groose, 15 F.3d

110, 112 (8th Cir. 1994) (citation omitted).  Even so, the factual allegations "must be enough to

raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544,

555 (2007).  The claimant may not merely allege "labels and conclusions" or a "formulaic

recitation of a cause of action's elements."  Id. at 545.  The allegations must move the claim

across the line from "possibility" to "plausibility."  Id. at 546.  This standard applies to claims

made under the Sherman Act.  See generally id.

**2. Sherman Act § 2**

Section 2 of the Sherman Act states in relevant part that "[e]very person who shall

monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several

States . . . shall be deemed guilty of a felony."  15 U.S.C. § 2.  To establish a § 2 violation,

Geospan must plausibly allege that: 1) Pictometry "possessed monopoly power in the relevant

market," and 2) Pictometry "willfully acquired or maintained this monopoly power by

anticompetitive conduct as opposed to gaining that power as a result of a superior product,

business acumen, or historical accident."  Concord Boat Corp. v. Brunswick Corp., 207 F.3d

1039, 1060 (8th Cir. 2000) (quotation omitted).[5]

Geospan alleges Pictometry has monopoly power in the "oblique aerial imaging" market. Using its 99% market share, Geospan alleges Pictometry has sent misleading "sole source" letters to potential "customers," namely city and county governments, informing these entities that Pictometry is the only supplier of oblique aerial imaging services in the country. By so doing, Geospan argues, Pictometry foreclosed bidding processes, deprived Geospan of possible business, and artificially inflated the cost of Pictometry's services and products. Countercl. §§ 1-19. Geospan further alleges Pictometry has engaged in a pattern of baseless litigation—including the present lawsuit—designed to exhaust Geospan's limited financial resources.

Geospan has failed to state an antitrust claim because the Noerr-Pennington shields the conduct alleged against Pictometry. Noerr-Pennington immunity derives from the First Amendment right to petition the government for redress of grievances. See E.R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); United Mine Workers of Am. v. Pennington, 381 U.S. 657 (1965). Generally speaking, the doctrine immunizes from antitrust and tort liability efforts taken to influence government action. See Cent. Telecomms., Inc. v. TCI Cablevision, Inc., 800 F.2d 711, 721-25 (8th Cir. 1986). The doctrine also protects the filing of lawsuits. See Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510-11

---

[5] Pictometry briefly argues Geospan lacks standing to bring an antitrust claim. Standing under the Sherman Act requires "an evaluation of the plaintiff's harm, the alleged wrongdoing by the defendant, and the relationship between them." Thus, standing is limited to a "consumer or competitor" who suffers an antitrust injury. Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519, 539 (1983). As discussed below, Geospan has failed to demonstrate an exception to the Noerr-Pennington doctrine. Assuming Geospan had, however, its position in the market relative to Pictometry establishes its standing to pursue such a claim.

(1972).  The only exception to Noerr-Pennington immunity applies when the effort taken, or lawsuit filed, is a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor."  Noerr, 365 U.S. at 145.

The Noerr-Pennington doctrine protects the sole source letters allegedly sent to Geospan's potential "customers."  In Paragraph 13 of the Counterclaim, Geospan alleges Pictometry sent "'sole source justification' letters to city and county governments across the United States, claiming to be the sole provider of oblique aerial imaging services and products in the country."  Geospan further alleges that "these letters" caused its potential "customers" to bypass their normal bidding processes.  As government entities, Pictometry's communications with these customers would generally be protected by the First Amendment, and thus immunized by the Noerr-Pennington doctrine.  Geospan strains to escape this conclusion by arguing that when it used the word "customers," it was also referring to private entities, meaning the Noerr-Pennington doctrine would not protect Pictometry at least with respect to these private customers.  When viewed as a whole, however, the only logical interpretation of the word "customers" in the Counterclaim is as a reference to government entities.  The Counterclaim refers to the same letters and public bidding processes throughout, and nowhere states or implies that a separate, private group of customers is at issue.  As a result, the Noerr-Pennington doctrine applies to Pictometry's alleged communications.

Geospan has also failed to allege sufficient facts to justify applying the "sham" exception to the sole source letters.  The sham exception to the Noerr-Pennington doctrine is a narrow one, applying only to political activity designed to "harass and deter" competitors in their use of governmental processes, to the point where "the machinery of the agencies and the courts" is

19

effectively closed to competitors.  Cal. Motor Transp., 404 U.S. at 511, 515.  Although First

Amendment rights are broadly protected, they may not be used to achieve "substantive evils,"

such as in service of a concerted effort to destroy competition.  Id.

Here, the sole source letters allegedly sent by Pictometry, while arguably including a

false statement, do not rise to the level of activity that "corrupts governmental processes to such

an extent that it constitutes access-barring conduct."  Razorback Ready Mix Concrete Co., Inc. v.

Weaver, 761 F.2d 484, 487 (8th Cir. 1985).  Geospan does not allege Pictometry used "bribery,

fraud, or unethical procedures" to deprive the city and county governments at issue of their

freedom to choose an oblique aerial imaging product.  Doron Precision Sys., Inc. v. FAAC, Inc.,

423 F. Supp. 2d 173, 183 (S.D.N.Y. 2006) (citation omitted).  Nor does Geospan allege

Pictometry had the power or influence to deprive municipal entities of their ability to hold

request for proposal processes or seek out other competitors.  Further, Geospan had the ability to

send its own communications to these customers at any time.  That certain municipal entities

allegedly chose to rely on Pictometry's unsolicited letter is not a corruption of the competitive

process.

The Noerr-Perrington doctrine also protects the patent claims filed by Pictometry in this

action.  The sham exception applies to litigation only when: (1) the litigation is shown to be

"objectively baseless in the sense that no reasonable litigant could realistically expect success on

the merits" and (2) the litigation is subjectively motivated by bad faith in the sense that it is

initiated as a "anticompetitive weapon."  Prof'l Real Estate Investors, Inc. v. Columbia Pictures

Indus., Inc., 508 U.S. 49, 60-61 (1993) (quotations omitted).  The Supreme Court suggested in

Prof'l Real Estate Investors that the standard for an "objectively baseless" suit is akin to the

standard for attorney sanctions provided by Rule 11 of the Federal Rules of Civil Procedure.  Id. at 60.

Using similar arguments to those stated against Pictometry's motion for injunctive relief, Geospan alleges Pictometry's present lawsuit is baseless and intended only to put Geospan out of business.  Specifically, Geospan argues that the '133 Patent's specification makes clear that the term "distance measuring mode" refers to a "walk the earth" method, which in turn relies on a tessellated ground plane.  As a result, Geospan argues, its own oblique aerial imaging method, which uses a digital elevation model, clearly does not infringe the patent.

Although Pictometry did not demonstrate it is more likely than not to succeed on its patent claim, thus entitling it to injunctive relief, Geospan has not carried its significant burden in showing this lawsuit to be objectively baseless.  Geospan has persuasively argued, for preliminary relief purposes, that the specification defines "distance measuring mode" according to a "walk the earth" method.  Arriving at that conclusion, however, was not a foregone conclusion.  Claim 17 itself does not explicitly refer to a "walk the earth" method or use the term "tessellated ground plane."  Further, the specification does not expressly define "tessellated ground plane" as excluding digital elevation models.  Reference to the prosecution history was necessary to make that determination.  Each step of this analysis was reasonably argued and supported by both parties, and this determination could be altered over the course of the litigation.  As such, the Court cannot hold Pictometry's claim lacks total merit, and the Noerr-Pennington doctrine shall apply.

Geospan's Sherman Act claim is dismissed with prejudice, because this claim has no viable basis for relief at law.  Assuming Geospan has properly defined the product market at

21

issue, the mere sending of sole source letters to some private customers would not constitute the willful acquisition and maintenance of "monopoly power by anticompetitive conduct."  <u>Morgan v. Ponder</u>, 892 F.2d 1355, 1358 (8th Cir. 1989).

### 3.  Attempted Monopolization

Geospan has also alleged an attempt to monopolize against Pictometry.  Because the <u>Noerr-Perrington</u> doctrine protects the conduct alleged against Pictometry, Geospan has not stated a claim for attempted monopolization.

### IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Plaintiff Pictometry International Corporation's Motion for Preliminary Injunction and Evidentiary Hearing [Docket No. 25] is **DENIED**.

2.     Plaintiff's Motion to Dismiss Counterclaim [Docket No. 12] is **GRANTED**, and Count 3 of the Counterclaim [Docket No. 10] is **DISMISSED WITH PREJUDICE**.

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  April 21, 2014.