# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Pictometry International Corporation,

      Plaintiff,

   v.

Geospan Corporation,

      Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 13-2359 ADM/JJK

_____

Joseph P. Titterington, Esq., and Douglas J. Sorocco, Esq., Dunlap Codding PC, Oklahoma City, OK, and Rachel K. Zimmerman, Esq., Merchant & Gould PC, Minneapolis, MN, on behalf of Plaintiff.

Kurt J. Niederluecke, Esq., Grant D. Fairbairn, Esq., and Ted C. Koshiol, Esq., Fredrikson & Byron, PA, Minneapolis, MN, on behalf of Defendant.

_____

## I.  INTRODUCTION

On July 16, 2014, a joint claim construction hearing was held before the undersigned United States District Judge in the patent infringement action brought by Plaintiff Pictometry International Corporation ("Pictometry") against Defendant Geospan Corporation ("Geospan"). The Court also heard oral argument on Geospan's Motion for Summary Judgment of Non-Infringement [Docket No. 76]. As stated herein, the Court construes one claim and grants Geospan's motion for summary judgment.

## II.  BACKGROUND

### A.  Litigation History

This is the fourth lawsuit between the parties in the past six years. On March 20, 2008, Geospan filed suit against Pictometry, alleging infringement of United States Patent No. 5,633,946 (the "'946 Patent") ("Geospan I"). On March 31, 2011, this Court entered a

declaratory judgment of non-infringement in Pictometry's favor.  See Geospan Corp. v. Pictometry Int'l Corp., No. 08-816, 2011 WL 1261583 (D. Minn. Mar. 31, 2011).  Geospan appealed, and on June 5, 2012, the Federal Circuit Court of Appeals affirmed the declaration of non-infringement in a per curiam decision.  See Geospan Corp. v. Pictometry Int'l Corp., 469 F. App'x 913 (Fed. Cir. 2012).

On October 13, 2009, while Geospan I was still pending, Pictometry sued Geospan in the Western District of New York, alleging infringement of United States Patent No. 5,247,356 (the "'356 Patent") ("Geospan II").  On June 2, 2011, the Western District of New York transferred Geospan II to the District of Minnesota, where it was assigned to Judge John R. Tunheim.  See Order, May 5, 2011 [Geospan II Docket No. 42].[1]  On August 17, 2012, Judge Tunheim construed one of the patent claims at issue and invalidated the other.  See Pictometry Int'l Corp. v. Geospan Corp., No. 11-1423, 2012 WL 3679208 (D. Minn. Aug. 17, 2012).  Thereafter, Pictometry stipulated to the dismissal of Geospan II, agreeing that based on Judge Tunheim's claim construction, Geospan did not infringe the '356 Patent.  Stipulation [Geospan II Docket No. 75].

On May 10, 2013, Geospan filed another suit against Pictometry in the District of Minnesota, again alleging Pictometry infringed the '946 Patent at issue in Geospan I.  That action ("Geospan III"), before Judge Susan R. Nelson, is ongoing.

On August 28, 2013, Pictometry filed the present action ("Geospan IV") against Geospan in this district.  Compl. [Docket No. 1].  Pictometry's sole cause of action in this suit alleges

---

[1]  Geospan I had Civil Case Number 08-816, Geospan II had Civil Case Number 11-1423, and Geospan III (discussed below) has Civil Case Number 13-1104.  Entries in Geospan IV, this action, will be cited as "[Docket No. 1]."

Geospan infringed United States Patent No. 7,424,133 (the "'133 Patent"), which Pictometry

owns by assignment.

**B.  The '133 Patent**

Pictometry and Geospan sell products and services in the field of photogrammetry, the

science of obtaining accurate information about physical objects through the interpretation of

photographs or other visual images.  Theodore M. Lachinski Decl., June 4, 2014 [Docket No. 80]

("Lachinski Decl.") ¶ 2.  Pictometry specializes exclusively in aerial photogrammetry, flying

aircraft with specialized cameras over a geographic area to collect images.  Pictometry then uses

these images to compile usable data about the terrain.  See Stephen L. Schultz Decl., Nov. 12,

2013 [Docket No. 27] ¶ 3.  Geospan initially began its photogrammetry services using ground-

based vehicles equipped with special cameras, and only later expanded into aerial

photogrammetry.  Lachinski Decl. ¶ 3.

The '133 Patent relates to the use of oblique imaging in photogrammetry.  Compl.

[Docket No. 1] Ex. A (the "'133 Patent").  The '133 Patent specification summarizes the

drawbacks associated with traditional photogrammetry, which typically uses orthogonal (at right

angle) images.  In this process, for instance, a plane captures images by pointing a camera

straight down at a "nadir point" directly underneath it.  In the resulting image, only the nadir

point is actually at a right angle to the camera; all other points (also referred to as "pixels")

around the nadir are at oblique angles and thus are increasingly distorted as they proceed further

from the nadir.  '133 Patent at 1:30-45.  The process of correcting these distortions may leave the

corrected (or "ortho-rectified") image difficult for untrained observers to use.  The corrected

images also include "substantially no information" about the height of the pictured terrain.  Id. at

1:57–2:10.

When an image-capturing device aims at a non-right angle relative to the terrain, it results in "oblique images."  These images of terrain display the sides of features on land, such as the sides of a house or the ridges of a mountain, and are much easier for a viewer to intuitively understand.  Id. at 2:11-20.  However, oblique images have traditionally been of little or no use in photogrammetry, because correcting the images for their skewed angles results in finished images that are even more distorted than corrected orthogonal images, and the resulting images do not offer usable geo-location data or accurate measurement data.  Id. at 2:32-47.

The '133 Patent describes a method and apparatus for "capturing, displaying, and making measurements of objects and distances between objects depicted within oblique images."  Id. at 2:60-63.  The invention uses oblique images, along with corresponding positional data, to calculate the distance between selected points.  In essence, it uses the more intuitive oblique images to perform some of the same tasks previously performed by orthogonal images in photogrammetry.  Id. at 2:60–3:12.

## C.  The Parties' Claims

In January 2011, the City of Branson, Missouri, held a request for proposals (RFP) for a mapping project.  Compl. ¶ 16.  Aeroquest Optimal, Inc. ("Aeroquest") submitted a bid in the RFP, and identified Geospan as a subcontractor.  Compl. Ex. 3 (Aeroquest RFP).  As part of the bid, Geospan described its "Geovista" system as allowing "users to see every location from every angle in a given area and measure anything accurately."  Id.  Geospan also offered software allowing "the user to view and navigate on the oblique imagery and measure the distance, height, area, bearing, elevation, and roof pitch of features in the images."  Id.

4

On August 28, 2013, Pictometry filed the present action ("Geospan IV") against Geospan, alleging Geospan has directly and indirectly infringed the '133 Patent through its Geovista system.  Compl. ¶¶ 19-27.  On October 4, 2013, Geospan filed counterclaims against Pictometry, seeking a declaration of non-infringement, the invalidation of the '133 Patent, and damages for abuse of process and violating the Sherman Act.  Answer & Countercl. [Docket No. 10].

**D.  Antitrust Counterclaim**

On October 25, 2013, Pictometry moved to dismiss the Sherman Act count of the Counterclaim.  In the Court's April 21, 2014 Order [Docket No. 69], the motion was granted and Geospan's antitrust counterclaim dismissed.  Geospan has since amended its Counterclaims to re-state Sherman Act claims.  Geospan also seeks declarations of the '133 Patent's invalidity and unenforceability, and Geospan also alleges an abuse of process claim.  See Am. Answer & Countercl. [Docket No. 98].  Those claims are not at issue in the present motion.

**E.  Preliminary Injunction**

On November 12, 2013, Pictometry moved for a preliminary injunction restricting Geospan from infringing any claim of the '133 Patent.  Mot. for Prelim. Inj. [Docket No. 25]. Pictometry subsequently clarified that it only alleged infringement of Claim 17.  See Pl.'s Mem. Supp. Prelim. Inj. [Docket No. 26] 2; see also Joint Claim Constr. Statement [Docket No. 73] ("Joint Claim Constr.").  Claim 17 states:

> A computerized method for taking measurements from an oblique image displayed on a computer system, at least one input device connected to said computer system, an image data file accessible by said computer system, said image data file including captured images and positional data corresponding thereto, said computerized method comprising:

5

> placing the computer system into a desired one of a plurality of measurement modes, the desired measurement mode configured for calculating a desired measurement;
>
> selecting a starting point on the displayed image;
>
> retrieving the positional data corresponding to said starting point;
>
> selecting an end point on the displayed image;
>
> retrieving the positional data corresponding to said end point; and
>
> calculating the desired measurement dependent at least in part upon said positional data of said starting and end points;
>
> wherein said plurality of measurement modes comprise a **distance measuring mode** calculating a distance between two or more selected points, a height measuring mode calculating a height difference between two or more selected points, a relative elevation measurement mode calculating the difference in elevation of two or more selected points, and an area measurement mode calculating the area encompassed by at least three points.

'133 Patent at 16:36-61 (emphasis added).  In arguing whether Pictometry was likely to succeed on the merits, the parties offered competing constructions for the term "distance measuring mode" of Claim 17.  Thus, as part of its holding, the Court tentatively construed this term and a related term in the specification.  Based on these constructions, the Court held Geospan had raised a "substantial question" as to whether the Geovista system infringed the '133 Patent.  Order, Apr. 21, 2014 (citing Genentech v. Novo Nordisk A/S, 108 F.3d 1361, 1364 (Fed. Cir. 1997) (holding a preliminary injunction should not issue if defendant raises a substantial question as to validity, enforceability, or infringement)).  The Court held the parties could revisit the construction of this term as the case continued.  See id. at 6.

**F.  Claim Construction and Summary Judgment**

Following the Court's April 21, 2014 Order, the parties proceeded with claim construction.  The parties submitted competing constructions for 9 terms in Claim 17, including "distance measuring mode."  <u>See</u> Joint Claim Constr.  In addition, Geospan moved for summary judgment of non-infringement.  Geospan argues that if the Court's final constructions are consistent with its initial, tentative constructions, no genuine issue of fact exists as to infringement.  <u>See</u> Mem. Supp. Summ. J. [Docket No. 78].

## III.  DISCUSSION

**A.  Claim Construction**

As discussed below, only one term—"distance measuring mode"—requires construction because, as construed, the term warrants summary judgment in favor of Geospan.  <u>Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.</u>, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy."); <u>United States Surgical Corp. v. Ethicon, Inc.</u>, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy.").

**1.  Standard of Review**

Claim construction is a matter of law.  <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 979-80 (Fed. Cir. 1995), <u>aff'd</u>, 517 U.S. 370 (1996).  In construing claims, courts should look first to intrinsic evidence, which includes the claims, the specification, and the prosecution history.  <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Claim

terms themselves are "generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (quotation and citations omitted).  Claim terms "should be construed consistently with [their] appearance in other places in the same claim or other claims of the same patent." Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001).

The construing court may also consult the patent specification; "it is the single best guide to the meaning of a disputed term." Vitrionics, 90 F.3d at 1582.  The specification often offers valuable context, but it should not change the plain meaning of claim terms.  See White v. Dunbar, 119 U.S. 47, 51 (1886) (cautioning against treating claim language "like a nose of wax, which may be turned and twisted in any direction, by merely referring to the specification").  And in general, courts must not import limitations from the specification into the claims. Phillips, 415 F.3d at 1323; Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1347 (Fed. Cir. 1998).  A specification may only limit a claim where the patentee acts as "his or her own lexicographer by clearly setting forth an explicit definition for a claim term." Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999).  Similarly, the specification may limit a claim's scope by using "words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002).

While courts can consider extrinsic evidence to educate themselves about the patent and technology at issue, it is improper to rely on extrinsic evidence in construing claims unless, after

consideration of all the intrinsic evidence, ambiguity remains.  Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc., 152 F.3d 1368, 1373 (Fed. Cir. 1998); Vitrionics, 90 F.3d at 1584.  Extrinsic evidence is "evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles."  Vitrionics, 90 F.3d at 1584.

   **2.   "Distance measuring mode calculating a distance between two or more selected points"**

   Claim 17 describes a computerized method for measuring the distance between two selected points on an oblique image.  '133 Patent at 16:36-41.  The described invention allows a user to choose "one of a plurality of measurement modes," with the chosen mode configured for "calculating a desired measurement."  Id. at 16:42-44.  The user may then select a "starting point" on the displayed oblique image and an "end point on the displayed image," and the system will calculate the desired measurement based at least in part on the "positional data" of the selected points.  Id. at 16:45-53.  Claim 17 describes the "plurality of measurement modes" available to the user as including: (1) a "distance measuring mode," which calculates "a distance between two or more selected points"; (2) a "height measuring mode," which calculates a height difference between two or more points; (3) a "relative elevation mode," which calculates the difference in elevation between two or more points; and (4) an "area measurement mode" which calculates the "area encompassed by at least three points."  Id. at 16:54-61.

   An understanding of the "tessellated ground plane" assists in construing "distance measuring mode."  The specification describes a tessellated ground plane as a three-dimensional computer model of the terrain of a surface.  A tessellated ground plane consists of interconnected

"facets," each of which have four vertices.  Id. at 10:41-44.  The four vertices each have individual elevations, meaning the corresponding facets each have a "pitch and slope."  Id. at 10:45-47.  The data for the vertices and the facets are derived from "topographical maps," "digital raster graphics," survey data, and "various other sources."  Id. at 10:49-50.  The resulting tessellated ground plane is a model which "closely follows or recreates the terrain" of a surface. Id. at 9:56-59.  Although Claim 17 does not expressly refer to a tessellated ground plane, other claims in the patent do, and the uses of the term both in the claims and the specification are consistent.  See, e.g., id. at 14:62-67 (Claim 1); see also Rexnord, 274 F.3d at 1342 (claim terms should be construed consistently).

The '133 Patent specification describes the "distance measuring mode" of Claim 17 as dependent on a tessellated ground plane.  Using the "distance measuring mode," a distance is "determinable along virtually any path," such as a single "straight-line" path or a path that includes intermediate points and one or more "straight-line" segments.  '133 Patent at 9:41-47.  The specification states, "It should also be particularly noted that the distance measuring mode . . . determines the distance between selected pixels according to a 'walk the earth" method.'"  Id. at 9:48-51.  The "walk the earth" method measures distance by creating "a series of interconnected line segments."  Id. at 9:51-54.  The line segments "lie upon or conform to the planar surfaces" of the tessellated ground plane and extend from one of the user-selected points to the other.  Id.  As a result, the "walk the earth" method measures distance by closely following the terrain of a surface.  See id. at 9:59.  The specification describes the "walk the earth" method as more accurate than the conventional, or "flat earth," method of measurement because the "flat earth" method "substantially ignores variations in terrain between the points."  Id. at 9:65-67.

In its April 21, 2014 Order denying Pictometry's motion for a preliminary injunction, the Court construed "distance measuring mode" as "a mode that determines the distance between two or more selected points according to a walk the earth method."  Order, Apr. 21, 2014 at 12. In support of its motion, Pictometry submitted a broader construction that allowed for either a "walk the earth" or a "flat earth" method of measurement.  The Court rejected this construction based on both claim language and the specification.  See Order, Apr. 21, 2014 at 10; '133 Patent at 16:54-61.  The Court held the specification reflected the inventors' intent to act as their own lexicographers and define "distance measuring mode" as specifically using the "walk the earth" method.  The specification's rejection of the "flat earth" method constituted a "manifest exclusion" and "clear disavowal" of claim scope.  Order, Apr. 21, 2014 at 11-12 (quoting Teleflex, 299 F.3d at 1325).

Pictometry now proposes a construction of "distance measuring mode" that largely echoes its previously submitted construction.  Pictometry proposes "distance measuring mode" is "A mode in which the computer system calculates a distance between at least two points/pixels on a displayed image."  Joint Claim Constr. at 9.  This construction, Pictometry contends, properly allows "distance measuring mode" to encompass both conventional, "flat earth" methods of measurement as well as the "walk the earth" method.

Pictometry offers several arguments urging the Court to revise its preliminary construction, but none are persuasive.  For instance, Pictometry argues that simple distance calculations using conventional photogrammetry are a preferred embodiment that the Court's construction improperly excludes.  In support, Pictometry cites a portion of the specification in which the inventors describe using the "difference between the geo-locations" of pixels in an

oblique image to determine their distance.  '133 Patent at 8:51-54.  Presumably, Pictometry contends the word "difference" means an absolute subtraction of values resulting in a simple distance calculation.

But Pictometry cites this language out of context.  The preceding paragraphs of the specification generally describe the system by which the invention operates, and the specification states that the difference between geo-locations will be used to determine distance only after "selecting the desired measurement mode."  Id. at 8:21-23.  In other words, the "difference" being calculated is not absolute, but rather varies according to the mode selected by the user.  Thus, the difference may be in terms of height in the "height measurement mode," or elevation if the user selects the "relative elevation mode."  If the user selects the "distance measuring mode," the invention of Claim 17 will measure the difference in locations between the two points by the "walk the earth" method.

Attempting to buttress its argument, Pictometry quotes the specification as stating that the invention will calculate the distance between two selected pixels using "known algorithms, such as for example, the Gauss formula and/or the vanishing point formula, depending on the selected measuring mode."  Id. at 9:24-31 (emphasis added).  Pictometry argues the "Gauss formula and/or vanishing point formula" are preferred embodiments that would otherwise be excluded by the "walk the earth" method.

Contrary to Pictometry's argument, the pivotal phrase in the quoted specification language is not the specific names of formulae, but rather the phrase "depending on the selected measuring mode."  The specification describes an invention that uses various "known algorithms" to calculate the distance between selected points in a way that satisfies the

measurement mode chosen by the user.  Thus, if a user chooses the "distance measuring mode"

of Claim 17, the invention's software will perform the "walk the earth" method of measurement

using the relevant "known algorithms."  Pictometry does not argue that the "walk the earth"

method of measurement somehow eschews the use of conventional math.

Pictometry's reading of the specification as stating additional embodiments also ignores

the broader context of the '133 Patent.  Immediately after the portions of the specification quoted

by Pictometry, the specification further states that "[i]t should be <u>particularly noted</u> that the

distance measuring mode" uses the "walk the earth" method.  <u>Id.</u> at 9:48-51 (emphasis added).

Stated another way, the specification does not list a series of alternatives, with the "walk the

earth" method being one way to implement the "distance measuring mode" in addition to "flat

earth" measurements.  Instead, the specification begins with general descriptions of measurement

principles and then specifies how one particular measurement mode is performed.  The

specification also unambiguously rejects the "flat earth" or conventional method of distance

measurement as inferior.  This is a "clear disavowal" of claim scope.  <u>Teleflex</u>, 299 F.3d at 1325.

Next, as it did in connection with the preliminary injunction, Pictometry again argues the

specification's use of the terms "linear distance" and "straight-line" identify conventional, "flat

earth" measuring as a preferred embodiment.  <u>See</u> '133 Patent 9:41-47.

Pictometry's argument remains unpersuasive.  As the Court previously held, the

specification's use of the term "'straight-line' path" makes clear that it is not referring to the

shortest distance between two points, but rather a straight line viewed as the crow flies.  <u>See id.</u>

The specification identifies as an example the "'straight-line' path P1" on Figure 6 of the '133

Patent.  <u>See id.</u>  As shown on Figure 6, this so-called "straight-line" path is anything but

"straight" when viewed in terms of its elevation changes.  The change in elevation is accounted

for by the "walk the earth" method, which "closely follow[s] the terrain" to measure distance.

 Id. at 9:54.  To illustrate this method and its advantages, the specification provides the example

of a "contractor preparing to bid on a contract for paving a roadway over uneven or hilly

terrain."  Id. at 10:1-8.  Using the "walk the earth" method, the contractor can accurately

determine the amount of roadway needed for the job.  Id.  Although from the driver's perspective

such a road (once paved) may appear straight, it nevertheless proceeds over significant changes

in elevation.  Pictometry's definitions of "linear distance" and "straight-line" directly contradict

the language of the specification.

Pictometry also argues that the Court's preliminary construction excludes distance

measurements made above the ground.  Pictometry argues the '133 Patent describes the

invention as allowing a user to measure "lengths, widths and heights" of "buildings, rivers,

roads, and virtually any other geographic or man-made structure."  '133 Patent at 9:24-39.  If the

Court construes "distance measuring mode" as limited to the "walk the earth" method, then the

patented system could not take measurements above the ground, such as from one side of a

building to another.

Although Pictometry is correct that the '133 Patent describes a system that is capable of

measuring man-made structures above the ground, Pictometry is incorrect that the Court's

construction excludes this capability.  Claim 17 identifies four measurement modes as

"compris[ing]" the "plurality of measurement modes" available to the user.  Id. at 16:54.  The

Federal Circuit Court of Appeals has interpreted the word "comprise" as open-ended.  See

Gillette Co. v. Energizer Holdings, Inc., 405 F.3d 1367, 1371 (Fed. Cir. 2005) (edit original).  In

Gillette, the patentee claimed a safety razor blade "comprising . . . a group of first, second, and third blades." Id. Reviewing the intrinsic evidence, the court deemed this language open-ended, meaning the invention was not limited to three blades but could also cover a razor with four blades. Id. at 1371-72. In this case, the '133 Patent describes a "plurality" of modes which include the four identified above. Nothing in the claim language or specification prevents Claim 17 from covering a system with additional measurement modes, including a mode allowing for simple distance measurements or measurements conducted above ground.

In addition, nothing in Claim 17 or the specification necessarily precludes the "walk the earth" method from measuring, for example, the side of a building. The "walk the earth" method measures distance by using line segments that "lie upon or conform to" the planar surfaces of a tessellated ground plane. See '133 Patent at 9:54 (emphasis added). If the tessellated ground plane includes facets simulating the sides of a building, the "walk the earth" method could presumably use line segments which "conform to" the side of the computer-modeled building and measure distance accordingly. Although the specification uses the easy-to-understand verb "walk," nothing in the patent limits the "walk the earth" method to surfaces on which only an actual person could walk.[2]

Finally, Pictometry argues the relevant provisional patent application, United States Provisional Patent Application No. 60/425,275 (the "'275 Application"), describes the use of conventional methods of distance calculation, such as with the Pythagorean theorem, to calculate

---

[2] Conversely, if the tessellated ground plane described in the '133 Patent does not include modeling information for man-made objects, then the specification makes clear the "distance measuring mode" could not measure such objects. The specification unequivocally states that the "distance measuring mode" relies on a tessellated ground plane to perform measurements. '133 Patent at 48-67.

15

the distance between two points.  See Joseph P. Titterington Decl., June 6, 2014 [Docket No. 85]

Ex. 2 ("'275 Application").  The Court's preliminary construction of Claim 17, Pictometry

argues, excludes this preferred embodiment.  Although the '275 Application describes both

conventional measurements and the "walk the earth" method, the '275 Application did not

include Claim 17 or even use the term "distance measuring mode."  In contrast, the '133 Patent

disavows conventional measuring as inaccurate, and specifically limits the "distance measuring

mode" to the "walk the earth" method.  As Geospan argues, the differences between the '275

Application and the '133 Patent reflects the patentees' choice to forgo tried-and-true methods of

measurement in favor of disclosing a new method.  The '275 Application thus does not warrant a

construction encompassing the "flat earth" method.

Geospan's proposed construction hews more closely to the text of the '133 Patent.  For

"distance measuring mode," Geospan proposes the following construction:

> a measurement mode that determines the distance between two or
> more selected points according to a walk the earth method that
> creates a series of interconnected line segments that extend between
> the selected points and which lie upon or conform to the planar faces
> of a series of interconnected facets that define a tessellated ground
> plane, wherein the tessellated ground plane is not a digital elevation
> model.

Joint Claim Constr.  This construction defines the "walk the earth" method as described in the

specification and limits the definition of the tessellated ground plane.  In connection with the

motion for a preliminary injunction, the parties disputed whether the tessellated ground plane

described in the '133 Patent covered the "digital elevation model" used by the Geovista system.

The Court previously concluded the tessellated ground plane did not include the digital elevation

model.  Order, Apr. 21, 2014 at 12-15.

"Distance measuring mode" shall be construed to mean "a measurement mode that determines the distance between two or more selected points according to a walk the earth method that creates a series of interconnected line segments that extend between the selected points and which lie upon or conform to the planar faces of a series of interconnected facets that define a tessellated ground plane."  This construction largely adopts Geospan's proposal, and supplements the Court's preliminary construction with additional detail from the specification. For the reasons stated above and in the Court's April 21, 2014 Order, the specification unequivocally limits the "distance measuring mode" to using the "walk the earth" method, and Pictometry's arguments have not altered this conclusion.  See Teleflex, 299 F.3d at 1327.  The Court declines to revisit the definition of "tessellated ground plane," finding it unnecessary to resolve the present dispute.  Vivid Techs., 200 F.3d at 803.

## B.  Summary Judgment

### 1.  Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The United States Supreme Court, in construing Federal Rule 56(c), stated in Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). However, the nonmoving party may not "rest on mere allegations or denials but must

17

demonstrate on the record the existence of specific facts which create a genuine issue for trial."

Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).  A plaintiff facing a summary

judgment motion cannot "get to a jury without any significant probative evidence tending to

support the complaint."  Rath v. Selection Research, Inc., 978 F.2d 1087, 1091 (8th Cir. 1992)

(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

### 2. Non-Infringement

Geospan argues that if the term "distance measuring mode" is construed to require the

"walk the earth" method of measurement, summary judgment in its favor is appropriate because

the Geovista system does not use the "walk the earth" method.  Theodore Lachinski, Geospan's

CEO, avers in a declaration that the Geovista system "does not include any mode that determines

the distance between two or more selected points according to a 'walk the earth' method."

Lachinski Decl. ¶ 5.  On the contrary, Lachinski states the Geovista uses the conventional, "flat

earth" method that "does not take into account changes in elevation along the path between two

selected points."  Id.

Geospan further argues its descriptions of the Geovista system do not create a genuine

question of fact.  As part of the Aeroquest bid that gave rise to the present dispute, Geospan

described the Geovista system as allowing "users to see every location from every angle in a

given area and measure anything accurately."  Compl. ¶ 16.  The system also allows "the user to

view and navigate on the oblique imagery and measure the distance, height, area, bearing,

elevation, and roof pitch of features in the images."  Id.  These descriptions, Geospan argues, do

not indicate any capability to measure distance according to the "walk the earth" method, and

Pictometry submits no argument or evidence to the contrary.  And the phrase "measure

anything," Geospan argues, is mere puffery.

Pictometry does not respond to Geospan's arguments on the merits, but rather argues summary judgment is premature under Rule 56(d) of the Federal Rules of Civil Procedure.  In his Rule 56(d) affidavit, Pictometry's counsel Joseph Titterington states Pictometry lacks the necessary source code to determine whether the Geovista system uses the "walk the earth" method of measurement.  See Joseph Titterington Decl., June 25, 2014 [Docket No. 89] ("Rule 56(d) Aff.") ¶ 4 & n.1.  Pictometry argues the parties have only begun discovery, and have yet to obtain the documents or conduct the depositions necessary to ascertain the Geovista system's functions.  See id. ¶ 8.

At oral argument on Geospan's motion, Pictometry submitted a supplemental declaration from its expert, Dana M. Slaymaker.  See Dana Slaymaker Supp. Decl., July 14, 2014 ("Slaymaker Supp. Decl.") (under seal).[3]  In the declaration, Slaymaker states he received from Geospan a working copy of the Geovista software and its underlying source code on July 1, 2014.  Id. ¶¶ 2-3.  Based on a preliminary review of the software, Slaymaker concludes Geospan disabled certain three-dimensional functions of the Geovista system.  Using Slaymaker's declaration, Pictometry insinuates Geospan recently and improperly edited its software to avoid liability for infringement, and possibly tampered with material evidence.  This initial evidence of tampering, Pictometry argues, requires a denial or at least deferral of summary judgment pending Slaymaker's complete review.

Geospan has two responses to Pictometry's Rule 56(d) request.  First, Geospan argues Pictometry took discovery in Geospan II regarding the Geovista system, and still has access to

---

[3]  The Slaymaker Supplemental Declaration was placed under seal upon a motion by Pictometry [Docket No. 105].

the relevant deposition transcripts.  Significantly, Slaymaker relied on one such deposition in opposition to the present motion for summary judgment.  See Dana Slaymaker Decl., June 25, 2014 [Docket No. 90] Ex. 4 (Lachinski Dep.).  Geospan also produced thousands of pages of discovery and copies of its Geovista software in advance of the present motion, and Pictometry has yet to identify any basis for infringement in the produced information.  Second, Geospan argues Slaymaker's supplemental declaration sets up a straw man argument.[4]  At best, Slaymaker's review indicates the Geovista system once had a three-dimensional distance measuring function.  In other words, even if Slaymaker is correct, the Geovista system may have been able to measure from one point to another in three-dimensional space.  This "point to point" measuring function, Geospan contends, does not meet the "walk the earth" method limitation.  Finally, Geospan vows no improper tampering has occurred.  Geospan states the source code submitted to Pictometry included a "change log," a summary of all changes made to the software over time.

Pictometry's Rule 56(d) request is denied.  Lachinski's declaration unambiguously states the Geovista system does not use the "walk the earth" method, and Pictometry's Rule 56(d) affidavit has not demonstrated a need for any specific information that might contradict this assertion.  Pictometry had the opportunity to review the Geovista system when it filed Geospan II, and presumably Pictometry investigated its infringement claim before filing Geospan IV.  Nevertheless, Pictometry fails to identify any evidence suggesting the Geovista system uses the "walk the earth" method.  See Rule 56(d) Aff. ¶ 4.  And in its request to defer summary judgment, Pictometry does not identify what "specific facts further discovery might uncover."

---

[4]  Geospan submitted a letter brief following the hearing.  See Letter, July 18, 2014 [Docket No. 104].

See Roak v. City of Hazen, Ark., 189 F.3d 758, 762 (8th Cir. 1999).  Instead, Pictometry

"believes" discovery as a whole will eventually demonstrate the Geovista system's "walk the

earth" capability.  Rule 56(d) Aff. ¶ 8.  Pictometry's affidavit suggests it has embarked on a

"fishing expedition," and Rule 56(d) should be used to delay summary judgment in this case

where the parties have essentially been in discovery for six years in similar lawsuits.  See

Gardner v. Howard, 109 F.3d 427, 431 (8th Cir. 1997).

Slaymaker's original and supplemental declarations similarly fail to demonstrate any

genuine issue of material fact as to the Geovista system's use of the "walk the earth" method.  In

his original declaration opposing summary judgment, Slaymaker reviewed, among other things,

Geospan's Geovista marketing materials, Lachinsky's deposition from Geospan II, the

Aeroquest bid at issue in the present case, and another bid involving Geospan in Hennepin

County, Minnesota.  Slaymaker Decl., June 25, 2014 at ¶¶ 5.A-E.  Nevertheless, Slaymaker

could not determine whether the Geovista system used the "walk the earth" method, stating he

needed to review the Geovista system and additional discovery.  Id. ¶ 6.A.  In his supplemental

declaration, after he conducted a preliminary review of both the Geovista's functioning software

and its underlying code, Slaymaker still found no evidence the Geovista system employed the

"walk the earth" method.  See Slaymaker Supp. Decl. ¶ 6.

In addition, Slaymaker's focus on a potentially disabled function of the Geovista system

does not warrant deferral of summary judgment.  Slaymaker cites lines of code indicating a

programmer overrode Geovista's three-dimensional capabilities.  See Slaymaker Supp. Decl. ¶

4.D.x.  (stating two-dimensional measurement will "for now" override "any 3D measurement").

Slaymaker concludes the Geovista system as edited could determine the height of the first

selected point, but would calculate the distance to a second point only in terms of length and width ("x,y" coordinates) while ignoring any change in elevation (the "z" coordinate). This functionality, Slaymaker opines, lacks key capabilities when compared to the description of the Geovista system Geospan submitted in the Aeroquest bid. According to Slaymaker, the current lack of advertised features suggests Geospan altered its software after submitting the bid but before Slaymaker's review.

Even if Slaymaker is correct, he does not demonstrate how this "3D measurement" uses—or could have used—the "walk the earth" method. The Geovista code described by Slaymaker potentially allows for the simple measurement of distance between two points in three-dimensional space. The "walk the earth" method uses a series of "interconnected line segments" to measure the distance between two points. '133 Patent at 9:53. Nowhere in Slaymaker's analysis does he demonstrate, or even speculate, as to how the Geovista system ever used a method of measurement employing interconnected lines. At oral argument, Pictometry conceded as much, but argued the disabled three-dimensional capability could lead to the inference that the "walk the earth" method existed somewhere deeper in the Geovista system's code. Such unfounded speculation, however, does not warrant a deferral of summary judgment.

This action—the fourth between the parties and the second concerning the Geovista system—has proceeded in earnest for almost exactly one year. Nowhere in the prior litigation, Pictometry's investigation of its claims before filing, or during the pendency of this lawsuit once filed, has Pictometry identified any basis for the Geovista system's infringement of the term "distance measuring mode," as construed by the Court. Without even a wisp of such evidence, Pictometry has failed to demonstrate a genuine question of material fact as to its claim.

22

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.     In interpreting the '133 Patent, the term "distance measuring mode" shall be

construed in accordance with this Order.

2.     Geospan's Motion for Summary Judgment of Non-Infringement [Docket No. 76]

is **GRANTED**.

BY THE COURT:


_____  s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  August 26, 2014.